IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.    1:19-CV-03667-RBJ

SYLVIA SIMPSON,
Plaintiff,

v.

CITY OF FOUNTAIN, COLORADO,
Defendant.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The City of Fountain (the "City"), by and through its attorneys, Nathan Dumm & Mayer P.C., hereby submits its Motion for Summary Judgment with supporting authority as follows:[1]

**INTRODUCTION**

Plaintiff ("Plf"), who advises she is a Hispanic woman, alleges she has severe headaches. She is also a very litigious individual, having been a plaintiff in multiple prior lawsuits, including a wholly unsuccessful prior lawsuit against the City. Plf last worked as the court administrator for the City, a promotion she received **after** her prior unsuccessful lawsuit. The City terminated Plf's employment only after complaints and an independent investigation found she engaged in offensive, inappropriate, and otherwise poor treatment of other City employees in violation of the City's Employee Policies & Procedures Handbook ("Employment Policy"). In response, Plf filed the instant lawsuit wherein she essentially checked the box as to every possible protected

---

[1] Defense counsel certifies they advised Plf's counsel of the intended filing of this Motion on several occasions in an attempt to confer and limit the issues before the Court. Defense counsel was ultimately informed that Plf opposes this Motion and would not dismiss any claims.

status she could try to claim and alleged the termination of her employment was discriminatory and retaliatory. Plf asserts four pending claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.* ("Title VII") (race, color, sex and retaliation) and one claim under the American with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). Plf, however, has completely failed to establish *prima facie* cases for any of her claims. Because her separation from the City is supported by clear evidence of misconduct by Plf and multiple violations of the Employment Policy, summary judgment is appropriate on all five of her claims.

## UNDISPUTED MATERIAL FACTS[2]

*Plf's Prior Employment History and 2012 Lawsuit against the City*

1. Plf claims to be of Hispanic origin. [Compl., ¶ 4].

2. Plf worked for the City from June 2004 through June 2018 and for much of her tenure, Scott Trainor ("Trainor") was the City Manager. [Ex. A, 25:24-26:4, 65:2-8][3].

3. In 2012, Plf sued the City alleging the City failed to promote her due to her national origin and color ("2012 Lawsuit"). [Ex. A, 12:19-14:24; 12-CV1959-RM-KLM, ECF 1][4]. Despite alleging discrimination in her prior lawsuit, Plf failed to make some of the assertions she now claims to have occurred. [Ex. A, 14:20-16:5].

4. Prior to filing her 2012 Lawsuit, Plf failed to comply with the Employment Policy's reporting requirement, even though she was aware of such a requirement. [Ex. A., 16:11-18:13].

---

[2] For purposes of this Motion only, to avoid any possible dispute over material facts, the City treats the following facts in the light most favorable to Plf.
[3] The City is aware that this Court prefers exhibits be limited. While ten exhibits have been attached to this Motion, two of them relate to Plf's deposition, which at Plf's request took place over two days. Plf's deposition was the only deposition taken in this case and, thus, the remaining exhibits involve documents and the transcript of a secret recording by Plf and, therefore, do not indicate any disputes over material facts.
[4] Plf is no stranger to suing or the related legal process. [Ex. A, 22:12-23].

5.     Trainor was involved in the promotional decision forming the basis of Plf's complaint in the 2012 Lawsuit, and despite working with Plf for five years before the 2012 Lawsuit, that suit was the first time Plf alleged impropriety by him. [Ex. A, 27:2-9].

6.     In 2014, the City prevailed at summary judgment in the 2012 Lawsuit. [Ex. A, 14:17-19; 12-CV-01959-RM-KLM, ECF 46].

7.     After the 2012 Lawsuit, Plf remained employed with the City for years, and Trainor even promoted Plf to court administrator[5] (one of several promotions Plf received over the years), gave her several salary increases and gave her positive performance evaluations. Plf acknowledges these actions were not discriminatory. [Ex. A, 20:19-21:9, 22:3-5, 26:16-19, 27:2-9, 32:11-23, 33:6-10, 35:3-23, 42:21-43:18, 43:20-44:13, 56:1-4, 66:5-11].

*Plf's Serious Misconduct during her Employment with the City[6]*

8.     Plf admitted she used the word "vagina" in a derogatory manner to refer to male City employees, and that her conduct violated the Employment Policy. [Ex. A, 116:9-19; 116:25-117:10, 118:19-25].

9. During her employment with the City, Plf admittedly discussed and joked with City employees, one of whom directly reported to her, about race and color at work. [Ex. A, 121:18-122:3, 146:12-147:3, 161:12-21, 163:17-23, 167:18-20].

10.    While in a supervisory role, Plf unnecessarily snapped at a police department employee during a meeting. [Ex. A, 118:12-22].

---

[5] As to this promotion, Plf admits the City could have engaged in a full hiring process, but instead Trainor chose to promote her, which belies her claims of discrimination and retaliation. [Ex. A, 41:16-24].
[6] The City was not the only employer with whom Plf had difficulty. She was asked by a judge at the Fourth Judicial District to leave her employment because he felt they should no longer work together. [Ex. A, 29:17-19].

11.     Plf has acknowledged that she can be brusque or short with people, and that her inappropriate behavior was documented on a performance review. [Ex. A, 124:24-125:1, 134:23-135:14].

12.     Plf had disputes with at least two employees in the police department, which is a department she had to work with in her role as court administrator. [Ex. A, 130:3-6].

13.     Plf also improperly and without permission directed a police officer to engage and not engage in certain conduct in a manner others at the City, not alleged to have engaged in discrimination or retaliation, found improper, and then Plf retaliated against the police officer. [Ex. A, 137:4-17, 138:14-22, 139:7-9, 140:12-17, 141:9-14].

14.     Further, while at work using City equipment, Plf improperly engaged in personal tasks for her children's sports team. [Ex. A, 124:6-13, 156:16-18].

*Schlabs Report: the Investigation into Plf's Serious Misconduct*

15.     Following reports from two Hispanic females of Plf's misconduct and violations of City policies, the City retained Glenn Schlabs ("Schlabs"), an independent third party, to investigate the allegations. [Ex. A, 106:20-107:14; Ex. C].

16.     After conducting interviews with Plf and a number of other City employees, some of whom Plf specifically requested be interviewed,[7] and conducting a review of Plf's personnel records, Schlabs issued a detailed report. ("Schlabs Report"). [Ex. C; Ex. A 155:5-156:15].

---

[7] Even the witnesses whom Plf asked to be interviewed did not support her allegations as set forth in this lawsuit and/or they admitted Plf engaged in inappropriate conduct. [Ex. A, 161:23-162:22, 163:12-164:7].

17. In the Schlabs Report, the investigator categorized Plf's alleged misconduct as being associated with "her dealing with people," her "remarks of an ethnic or racial nature," and her "inability to work productively with other areas within the City." [Ex. C, pp. 1-2].

18. As detailed in the Schlabs Report, Schlabs recommended Plf receive discipline up to termination of employment for the following eight areas of sustained misconduct: (i.) Plf's poor treatment of her colleagues; (ii.) Plf's inappropriate email to a police officer; (iii.) Plf's comments about race and color; (iv.) Plf's snapping at another employee; (v.)Plf's negative remarks about a subordinate; (vi.) Plf's "general proclivity towards bluntness and rudeness"; (vii.) Plf's use of the word "vagina," "ethnic remarks," and "use of the 'n' word"; and (viii.) Plf's handling of a subordinate's workers' compensation claim. [Ex. C, p. 11; Ex. A, 153:19-155:4].

*Plf's Termination from the City*

19. Plf's employment with the City was at-will, which she has acknowledged she fully understood and for which she signed an acknowledgment. [Ex. A, 52:4-19; Ex. J].

20. The court administrator job description includes essential functions of maintaining and supporting a positive, collaborative culture within the City organization, as well as to embrace the cultural and value statements espoused by the City. [Ex. A, 46:11-18]. It also required Plf to work with other City employees for the best of the City. [Ex. A, 44:19-46:24].

21. The 2015 Employment Policy governed Plf's employment. [Ex. A, 47:4-23]. Plf signed an acknowledgment form confirming her understanding that she was required to be familiar with and have read the City's policies. [Ex. J]. The Employment Policy clearly prohibited harassment and discrimination, and imposed mandatory reporting obligations on Plf. [Ex. A, 46:25-47:8, 47:10-48:13, 48:25-50:12; Ex. J].

22.     Plf understood she could be disciplined for failure to comply with the Employment Policy, but she nonetheless failed to comply. [Ex. A, 56:8-10, 56:25-57:25].

23.     Plaintiff was also aware that under City policies, she had no implied or expressed right to progressive discipline, and that all discipline was subject to the discretion of City management. [Ex. A, 53:13-54:12; Ex. J].

24.     Based on the Schlabs Report, the City notified Plf of the termination of her employment because of her multiple violations of the Employment Policy. [Ex. D, p. 1, Ex. A, 174:4-176:23].

25.     With the assistance of legal counsel, Plf initially appealed the termination decision, and after review, Trainor denied the appeal finding Plf's grounds for appeal were unsubstantiated. [Ex. A, 177:3-16; Ex. E]. Plf acknowledged her appeal contained inaccuracies given her admitted misconduct.  [Ex. A, 176:24-177:10; 178:14-179:1].

26.     Plf then submitted a second appeal to a Personnel Board ("Board"), which is comprised of independent citizens, who do not actually make employment decisions, but rather provide input. [Ex. A, 192:6-8, 193:5-10, 199:9-12; Ex. G].

27.     A hearing was held, wherein Plf was represented by legal counsel. [Ex. A, 192:17-19]. Following the hearing, the Board advised Plf's termination was not the result of discrimination or retaliation of any kind. [Ex. F, ¶ 12]. The Board further concluded that racial slurs, sexual references to genitalia and insulting and demeaning remarks by any employee had no place in the work place at the City, and that Plf had admitted to engaging in such conduct. [Ex. F, ¶¶ 6-7]. While the Board commented that if there was a way to allow Plf and her subordinates to both remain employed, but not work with one another, that should be considered, the City found that was not feasible given the respective roles at issue. [Ex. F, ¶ 14; Ex. G].

28.     The City Council reviewed everything and upheld Plf's termination. [Ex. G].  The Mayor, who is Hispanic, signed the City's Council's finding. [Ex. A, 199:3-200:4; Ex. G]. Plf has no information that any member of the City Council was biased. [Ex. A, 200:5-12].

29.     Trainor is the only person affiliated with the City whom Plf alleges discriminated or retaliated against her.[8] [Ex. A, 60:24-61:9].

*Plf's Current Claim of Title VII Discrimination on the Basis of Race and Color[9]*

30.     Plf has no evidence establishing Trainor treats minority City employees differently from other City employees. [Ex. A, 68:25-70:13].

31.     Prior to 2017, years before her separation from the City, Plf alleges Trainor laughed when another City employee called her a "Mexican snob." [Ex. A, 65-66, 93-94].

32.     Well before Plf's separation, Trainor sent an email to some City employees about a chili cook-off that parodied President Trump's promise to build a border wall between the United States and Mexico ("Chili Cook-Off Email"). [Ex. H]. Plf was aware the Chili Cook-Off Email was parodying this campaign promise. [Ex. B, 272:21-273:5]. Plf did not believe the Chili Cook-Off Email was about her, but she now claims she was offended by it. [Ex. A, 210:1-10]. The Chili Cook-Off Email is the only comment Plf claims Trainor made that was discriminatory on the basis of race, color, or national origin even though they worked together for a decade. [Ex. A, 93:22-94:4, 209:20-211:11].

*Plf's Current Claim of Title VII Discrimination on the Basis of Sex*

33.     Plf's termination is her sole basis for alleged sex discrimination. [Ex. A, 77:7-12].

---

[8] This is relevant given Plf did not know who all was involved in the termination decision. The fact that the City Attorney, Plf's last supervisor, was involved in the decision further belies her contentions. [Ex. A, 175:13-24].
[9] Plf admits some of her allegations concern conduct which occurred well before 300 days prior to her filing a charge of discrimination and, thus, are untimely. [Ex. A, 65:9-66:4].

34. Plf admitted Trainor never made inappropriate remarks about her gender nor did they communicate much prior to her separation. [Ex. A, 75:20-76:10, 93:19-21; Ex. B, 271:1-272:14].

35. Plf's allegations about other female employees' alleged sex discrimination is not supported by any evidence. [Ex. B, 282:5-288:14].

*Plf's Current Claim of Title VII Retaliation*

36. Plf's retaliation claim is based solely on her 2012 Lawsuit. [Ex. A, 95:22-25, 98:25-99:4].

37. The only evidence Plf has set forth in support of this claim is a secret recording she made during a meeting concerning her promotion to court administrator.[10] [Ex. A, 96:17-97:15; Ex. I]. The pertinent discussion, as set forth below, occurred years prior to her termination, was initiated by Plf and establishes it was Trainor who made clear he had no concerns working with Plf:

> Trainor: You're going to be comfortable working for me?
> Plf: I don't know. We'll see. Yeah, I'm comfortable.
> Trainor: If you're not, I mean – because that's huge.
> Plf: I was trying to make light.
> Trainor: All right. All right. Well, I just – you know, because of the past –
> Plf: Right. (Unintelligble).
> Trainor: Right. But that's sort of the elephant in the room, you know what I mean? And so it's like –
> Plf: Yeah. Is it going to be something you always have in the back of your head or what?
> Trainor: That's a great question. Not from my standpoint, but I worry from your standpoint. . . . So from my standpoint, no, it's not in the back of my mind, other than thinking about it from your perspective. So if you're cool with it, there doesn't need to be an elephant in the room.

[Ex. I, 30:20-32:21].

---

[10] This was not Plf's only secret recording. She also secretly recorded Schlabs, even though she had never met him before and had no reason to believe he would do anything improper. [Ex. A, 106:10-13, 108:8-10, 109:13-21]. Further, Plf was dishonest with Schlabs about the fact she was recording, even though she knew dishonesty could be grounds for termination. [Ex. A, 111:21-113:25]. Plf's purpose in secretly recording Trainor and Schlabs was that she hoped they would say something she could use to her advantage later and because she expected she may proceed with litigation. [Ex. A, 106:20-25; 107:23-108:10, 109:13-24, 111:14-16, 114:4-8].

*Plf's Current Claim of ADA Discrimination*

38. Plf claims she suffers from severe headaches since 2008, which was before she was hired by the City. [Compl., ¶ 40; Ex. A, 84:18-22]. Plf admittedly received promotions, salary increases and positive evaluations during the years she contends she was disabled. [Ex. A, 84:18-22, 85:3-25, 87:16-18].

39. Years before her separation, Plf claims she may have mentioned to Trainor she received Botox injections and attended medical appointments. [Ex. A,83:12-23].

40. Plf admits she never specifically told Trainor she had a disability nor did he make any remarks related to a disability. [Ex. A, 80:15-22, 84:1-6; Ex. B, 269:9-19, 270:20-25].

41. Plf submitted a written request to the City's human resources department to obtain a special chair, although she did not explicitly state it was for any disability, but the request was initially denied for budget reasons. [Ex. A, 85:16-25].

42. Even though Plf was responsible for the budget, she did not add the chair to any successive budgets and she admittedly does not have the special chair at her current job. [Ex. A, 86:8-10, 89:10-90:12].

43. Although Plf asked for a movable desk, it was also not in the budget or added to it by her and she does not have one at her current job. [Ex. A, 86:20-87:12; 91:1-3].

44. After Plf made a request for a workstation evaluation, the City performed the evaluation, which is more than her current employer has done. [Ex. A, 86:11-15; 86:16-19; 90:13-25].

45. At various times, from 2013 through 2018, so starting well before her separation, Plf took time off for medical appoints and extensive leave under the Family and Medical Leave Act ("FMLA"); essentially maxing out the leave available each year. [Ex. A, 211:17-25]. Neither

Trainor nor the City ever took any adverse action as a result of Plf's leave. [Ex. A, 157:3-21, 211:17-212:16].

## STANDARD OF REVIEW

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)).

## LEGAL ARGUMENT

### A. Plf cannot establish her claims for discrimination under Title VII.

Title VII makes it unlawful for an employer to discriminate because of an individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Courts apply the *McDonnell Douglas* framework when reviewing Title VII claims asserting discrimination on the basis of race, color, sex, and retaliation. *Exby-Stolley v. Bd. of County Comm'rs*, 906 F.3d 900, 909 (10th Cir. 2018). Under this framework, the plaintiff alleging discrimination bears the burden to establish a *prima facie* case for discrimination or retaliation by showing that her employer took an adverse employment action against her based on her protected status or activity. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (citations omitted). An adverse employment action constitutes "a significant change in employment status, such as

-10-

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citing *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012)).

For retaliation claims, in addition to the protected activity, courts examine whether "a reasonable employee would have found the challenged action materially adverse" and whether "a causal connection existed between the protected activity and the materially adverse action." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (*citing Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 2006 WL 1806605 at *7 (10th Cir. 2006)).

If the plaintiff meets her burden in establishing a *prima facie* case of discrimination, the burden shifts to the employer to put forth a legitimate and non-discriminatory reason for taking the adverse action against the plaintiff. *Hiatt*, 858 F.3d at 1316 (citing *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016)). "If the employer satisfies this burden, 'then summary judgment is warranted unless [the plaintiff] can show there is a genuine issue of material fact as to whether the proffered reason[] [is] pretextual.'" *Hiatt*, 858 F.3d at 1316 (quoting *Bird v. W. Valley City*, 832 F.3d at 1200) (alteration in source). "In cases where 'the employee was hired and fired by the same person within a relatively short time span,' there is 'a strong inference that the employer's stated reason for acting against the employee is not pretextual.'" *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)).

### 1. Plf cannot establish discrimination on the basis of race or color.

Plf cannot establish a *prima facie* case that Trainor discriminated against her on the bases of race or color. Trainor's alleged conduct is the same for both protected statuses and is based on

the following: Trainor allegedly treated minority employees differently from white employees; he laughed at a singular comment related to Plf being a "Mexican snob;" and he wrote the Chili Cook-Off Email. The first two bases are unsubstantiated by any evidence, and in fact, the independent records from the alleged third parties bely that Trainor treated minority and white employees differently. These first two bases also refer to conduct that is mostly outside of the statute of limitations period and thus cannot constitute actionable discrimination. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1185, 2003 (10th Cir. 2003) (holding that discrete acts of alleged discrimination occurring outside statute of limitations period are time-barred). Further, the use of the word "Mexican," a facially neutral description of national origin, does not automatically connote racism nor would the fact that Trainor laughed at such a description. *See, e.g.*, *DeGourville v. Andrews Int'l*, 2014 U.S. Dist. LEXIS 117228, *41 (D. Colo. Aug. 6, 2014) (finding that calling Trinidadian Plaintiff a "troublemaker" did not have any racial or national origin connotations). This is particularly true when Trainor worked with Plf for essentially a decade and there is no allegation that Trainor engaged in "a [previous] course of conduct which is tied to evidence of discriminatory animus." *O'Shea v. Yellow Tech. Servs.*, 185 F.3d 1093, 1097 (10th Cir. 1999) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999)); *see also Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (finding insufficient discrimination alleged for purposes of Title VII when Plaintiff alleged during his eight years of employment "two overtly racial remarks . . . and one arguably racial comment").

The Chili Cook-off Email by itself is insufficient to show racial animus on the part of Trainor. He used a well-known talking point of President Trump to joke about his own chili. Specifically, he said, in the voice of the President, "I'm going to make Mexico pay for it [*i.e.*, the

chili]." Trainor did not say anything negative or offensive about Mexicans, Mexican Americans, darker-skinned people, or about Plf's race or color in particular. Moreover, Trainor's email had nothing to do with Plf's job, job functions or her performance of her job. Adopting for the sake of parody the President's political taking point that Mexico will pay for a border wall does not establish discrimination. Further, Trainor sent this email to multiple City employees, not just Plf, thereby indicating that Trainor was not targeting Plf because of her race or color. *See Westby v. BKD CPAs & Advisors, LLP*, 2019 U.S. Dist. LEXIS 107996, \*15 (D. Colo. Feb. 8, 2019) (finding no discriminatory conduct when the alleged conduct was not directed at the plaintiff); *Hindman v. Thompson*, 557 F. Supp. 2d 1293, 1304 (D. Okla. 2008) (same); *Jackson v. United States Postal Serv.*, 162 F. Supp. 2d 1246, 1254 (D. Kansas 2001) (same). While Trainor's attempt at humor may have failed, the email is not evidence of racial or color discrimination. *See Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) ("[T]he run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.").

Ultimately, the isolated email to which Plf claims to take have taken offense cannot form a sufficient basis of discrimination under Title VII. The United States Supreme Court's opinion in *Harris v. Forklift Sys.*, 510 U.S. 17 (1993) is instructive on this point. The Court explained that alleged discriminatory conduct must rise above offensiveness for it to constitute violation of Title VII. *Harris*, 510 U.S. at 21; *see also Hounton v. Gallup Indep. Co.*, 113 Fed. App'x. 329, 333 (10th Cir. 2004) (citation omitted) (holding that plaintiff's "subjective belief that he has been discriminated against, standing alone, is not sufficient to preclude the grant of summary judgment."). "'[The] mere utterance of an . . . epithet which engenders offensive feelings in an

employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)). A Title VII violation only occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB*, 477 U.S. at 65, 67). Plf's allegations in this case simply do not pass muster in establishing a permeation of racial and/or color discrimination during her tenure with the City.

Furthermore, assuming for the sake of argument that Plf has established a *prima facie* case of race/color discrimination, the City had legitimate, non-discriminatory reasons to terminate Plf. Indeed, it is undisputed the City had eight legitimate reasons. Schlabs, whom Plf admitted was not biased, concluded after conducting interviews and a review of Plf's personnel records that her conduct warranted disciplinary action, including termination, for serious misconduct as described above. Notably, this extensive list of misconduct included Plf's own inappropriate comments about race and color, which went well beyond anything Plf tries to claim was discrimination. Plf also admitted she sent the email to the officer, commented about people's race and color in the workplace, could be brusque, and used the word "vaginas" to derogatorily refer to male employees.

In addition to Plf's serious misconduct, Plf herself admitted that the Employment Policy required her to report any violations thereof and that she—out of all of her allegations raised in this lawsuit—only informally reported the Chili Cook-Off Email. Each policy violation Plf witnessed that she did not report constituted her own policy violation and grounds for

termination. That being said, the City did not need cause for Plf's termination: her employment was at-will and she was not entitled to any pre-termination progressive discipline; nevertheless, she received the benefit of extensive post-termination process. Further, there is no evidence that the multiple decision-makers beyond Trainor, including Schlabs, the City Attorney, the Board and the City Council, acted in a discriminatory manner. Rather, the City Attorney, the Board and Mayor Oretega, on behalf of himself and the City Council, all determined Plf's conduct was improper and not the result of discrimination or retaliation.

The City's termination of Plf, which was substantiated and well-documented, establishes there was no pretext based on racial or color discrimination on the part of Trainor. He hired Plaintiff as the court administrator in 2015, which Plf failed to satisfactorily perform and otherwise violated the Employment Policy. In 2018, Trainor terminated Plf's employment based on Schlabs' substantiated findings of Plf's misconduct. The City, therefore, is entitled to the inference that Plf's termination was not pretextual under the same actor doctrine.

Thus, because Plf cannot establish a prima facie case for race/color discrimination, and even if she could, it is undisputed the City had a legitimate business reason for taking adverse employment action against her, summary judgment is appropriate in the City's favor.

### 2.     Plf cannot establish discrimination on the basis of sex.

Plf alleges that Trainor discriminated against her due to her sex, but she has failed to adduce any evidence of this. Instead, Plf admits Trainor never said anything discriminatory about her and there is no evidence he discriminated against her or others due to their sex. Like with her race and color claims, her position is rooted in unsubstantiated hearsay, which was actually disproved by the evidence.

Further, as discussed in the prior section, the City had legitimate, non-discriminatory cause to terminate Plf. This cause included Plf's own discrimination of male employees on the basis of sex. She has admitted she referred to male employees as "vaginas" in order to belittle them. Thus, the City is entitled to summary judgment on this claim as well.

### 3. Plf cannot establish her termination was based on retaliation.

The undisputed evidence demonstrates that Plf was not terminated in retaliation for the 2012 Lawsuit. Indeed, there is no causal connection between the 2012 Lawsuit, which resolved in the City's favor in 2014, and Plf's termination in 2018, *four years later*.

The only allegations Plf even tries to raise as evidence of Trainor's retaliatory motive is a discussion she secretly recorded with the intent to try to set up a claim or lawsuit—all while she was discussing Trainor giving her a promotion. As to that discussion, the plain language of the transcript contradicts Plf's description of the events, showing she is an inaccurate reporter. Further, it was Trainor who made favorable remarks toward Plf, which is inconsistent with Plf's contention. The evidence also shows Trainor advanced Plf's career at the City following the 2012 Lawsuit. Trainor promoted Plf, increased her salary several times, and gave her overall positive performance reviews all after the 2012 Lawsuit. Trainor's positive intentions towards Plf and lack of animus show Plf's retaliation claim to be frivolous.

Finally, as with Plf's other Title VII claims, the City had a legitimate, non-retaliatory reason for her termination: her substantiated serious misconduct. Unlike her allegations of retaliation, there is a direct causal and temporal connection between Schlabs' investigation into Plf's serious misconduct and her termination shortly thereafter as a result of his findings. Thus, summary judgment should also be granted as to this claim.

### B. Plf has not established an ADA Claim for Discrimination

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "An ADA Plf may prove discrimination by providing direct evidence of discriminatory conduct." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019) (citing *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011)). Direct evidence "must prove the existence of a fact in issue without inference or presumption." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1188 n.6 (10th Cir. 2007) (quotations omitted). Examples of direct evidence are a facially discriminatory policy and statements evidencing a discriminatory motive. *Tesone*, 942 F.3d at 995 (citations omitted).

In the absence of direct evidence, the court applies the *McDonnell Douglas* framework already referenced above. *Id.* (citation omitted). The first part of that framework requires Plf prove (1) that she is disabled within the meaning of the ADA; (2) that she is qualified for the job held or desired; and (3) that she was discriminated against because of his disability *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (quoting *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218-19 (10th Cir. 2016)). The third element "requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

Then, as with Title VII claims, once Plf meets her burden, the burden shifts to the City to establish a legitimate, non-discriminatory reason for the adverse action. *Hiatt*, 858 F.3d at 1316.

If the City meets its burden, the burden shifts back to Plf to establish that the City's reason for the adverse action was pretextual. *Id.*

Here, there is no direct evidence that Trainor discriminated against Plf because of her alleged disability: severe headaches.[11] Thus, all that can possibly be considered at issue in this case is whether Plf has met her burden under *McDonnell Douglas*, which she has not.

Plf alleges Trainor discriminated against her because other employees at the City denied two of her requests: a request for a special chair and for a movable desk. Plf has not, however, alleged any connection between Trainor and these denied requests. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1210 (10th Cir. 2018) (granting summary judgment in employer's favor because plaintiff failed to establish requite causal connection). Plf also has not put forth any evidence that the denial of Plf's requests was based on or connected to her alleged disability.

There are a number of basis belying this claim.  First, with respect to both the special chair and desk, they were initially denied because they were not in the budget. This is a facially neutral basis. Not only that, Plf declined to use the control she had over the budget to make sure such items were subsequently budgeted for. Second, Plf also did not make another request for either, even though she could have.  Third, Plf has not established that Trainor knew of such requests and was behind their denials or that the persons to whom each request was allegedly made had the power to grant the requests.  Fourth, Plf has not established that the requests were tethered to specific information known to the City of a disability by Plf.  Any one of these facts, let alone all in combination, disavows any claim of discrimination on the part of the City or

---

[11] For purposes of this Motion, to ensure the analysis is in the light most favorable to the Plf, the City does not address whether Plaintiff even has a disability as defined by the ADA. The City, however, does not waive its right to raise this issue and dispute the existence of disability at a later time.

Trainor. Moreover, Plf's allegations about both the desk and the chair ring hollow because Plf has not even requested these items at her new place of employment.

What is clear from the record is that Plf received no resistance from the City in accommodating her frequent medical needs per her requests. For instance, the City granted Plf's request for a workstation evaluation and performed the evaluation; the City allowed Plf to take as much FMLA leave and time off for medical appointments as needed; and the City and Trainor in particular also promoted Plf on several occasions, and gave her raises and positive evaluations, all while Plf contends she was disabled. Consequently, Plf cannot establish a *prima facie* case of ADA discrimination. Furthermore, the City terminated Plf not for her disability, but because of her confirmed serious misconduct and policy violations. Thus, summary judgment as to Plf's ADA claim is necessary.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, the City respectfully requests summary judgment as to all of Plf's claims, an award of its costs, and that this Court award such other and further relief as it deems appropriate.

Respectfully submitted this 21st day of December, 2020.

> *s/Marni Nathan Kloster*
> Marni Nathan Kloster
> Ashley Hernandez-Schlagel
> NATHAN DUMM & MAYER P.C.
> 7900 E. Union Avenue, Suite 600
> Denver, CO  80237-2776
> Phone Number:  (303) 691-3737
> Facsimile:  (303) 757-5106
> *Attorney for Defendant*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 21st day of December, 2020, I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following at their e-mail addresses:.

Daniel L. Chandler
The Kanthaka Group
1465 N. Union Blvd. Suite 100
Colorado Springs, CO 80909
dchandler@kanthakagroup.com
*Attorney for Plaintiff Sylvia Simpson*

                                            *s/Marni Nathan Kloster*
                                            Marni Nathan Kloster
                                            Ashley Hernandez-Schlagel
                                            NATHAN DUMM & MAYER P.C.
                                            7900 E. Union Avenue, Suite 600
                                            Denver, CO  80237-2776
                                            Phone Number:  (303) 691-3737
                                            Facsimile:  (303) 757-5106
                                            *Attorney for Defendant*